## Sheetz v. Harrer

314

*Richard Angino,* for plaintiffs.
*John O'Brien, III,* for defendant Isaacson.
*James Stroud,* for defendants Prodoehl, West, Tukey-Larus and Lankenau Hospital.
*Kevin Wright,* for defendant Harrer.

SALUS, *J.,* November 21, 1995—This appeal stems from the court's order of September 11, 1995, denying the motion for post-trial relief of plaintiffs Leah Sheetz, a minor, and her parents Linda and H. James Sheetz. Plaintiffs contend that the court erred in (1) denying plaintiffs certain discovery, (2) presenting defendant Lankenau Hospital's point for charge no. 10 to the jury, (3) precluding certain testimony by expert witness Dr. Mary Jane Minkin, (4) entering judgment of nonsuit with respect to defendants Dr. William J. West and Dr. Anne Prodoehl, (5) permitting references to certain

portions of a report by Dr. Robert Clancy, (6) refusing to impose sanctions in the form of a default judgment against Lankenau Hospital, and (7) failing to set aside the jury verdict and grant a new trial. Plaintiffs' contentions are addressed below.

## FACTUAL AND PROCEDURAL HISTORY

This medical malpractice action arises from the events surrounding the birth of Leah Sheetz at Lankenau Hospital on September 16, 1989. Leah's parents, Linda and H. James Sheetz, were residing near Lancaster, Pennsylvania with their two children. Linda, age 37, was in her third pregnancy with a due date of November 15, 1989. Linda's prenatal care was being provided by Dr. Daniel E. Harrer at Lankenau Hospital in Merion, Pennsylvania. Although Lankenau was about a 90 minute drive from their home near Lancaster, Linda's previous pregnancies had been attended by Dr. Harrer at Lankenau, and Linda and James felt comfortable making the long drive.

In the evening of September 15, 1989, Linda began to feel ill, describing flu-like symptoms, fatigue and loss of appetite. She went to bed, but was awakened shortly after midnight on September 16 by wetness in the bed, apparently caused by ruptured membranes. Linda was concerned, and at 1:27 a.m. placed a call to Dr. Harrer's office. Linda spoke to Dr. Howard Isaacson, who was on call for Dr. Harrer that morning. Upon obtaining this information, Dr. Isaacson instructed Linda to promptly proceed to the hospital, and Linda departed for Lankenau with James and the children at approximately 2 a.m.

Upon arriving at Lankenau, Linda was admitted to the labor and delivery area, where she was placed on electric fetal monitoring at approximately 3:55 a.m.

Suspecting a high-risk pregnancy, an attending nurse, Joan Kaczenski, notified Dr. Anne Prodoehl shortly after 4 a.m. Dr. Prodoehl then notified Dr. Corinne N. Tuckey-Larus, and both residents arrived in the room before 4:30 a.m. Linda was examined in triage, a vaginal exam was performed, vital signs were taken, blood work was done, and an IV and oxygen were administered.

Fetal heart monitoring demonstrated a normal baseline rate, but with occasional decelerations which prompted the residents and nurses to continue close monitoring. The fetal heart rate remained satisfactory until approximately 5:10 a.m., when a persistent pattern of decelerations began. Dr. Isaacson, although preferring vaginal deliveries for premature babies, concluded that a caesarean section was necessary, and ordered a caesarean section at 5:30 a.m. Following notification of the anesthesia department, the caesarean section was commenced at 5:59 a.m., and Leah Sheetz was delivered at 6:15 a.m. Leah weighed three pounds, fourteen ounces, with an APGAR score of four at one minute and six at five minutes. The pathological report noted inflammation of the placenta. Leah experienced episodes of apnea and was placed on a mechanical ventilator.

Following her discharge from the nursery and multiple evaluations, Leah was diagnosed with cerebral palsy. On August 30, 1991, plaintiffs filed suit against Lankenau Hospital and numerous hospital personnel, alleging that understaffing, improper supervision, failure to recognize trouble signs in Linda's pregnancy and other negligent acts or omissions led to delays in the performance of the caesarean section, which was a substantial factor in causing Leah's cerebral palsy.

After three years of often bitter discovery disputes, trial commenced on October 31, 1994. At the conclusion

of plaintiffs' case-in-chief, compulsory nonsuits were granted for both Dr. Prodoehl and Dr. West. On November 10, 1994, the jury returned its verdict, finding no negligence on the part of remaining defendants Dr. Isaacson, Dr. Tuckey-Larus or Lankenau Hospital. On November 14, 1994, plaintiffs filed a motion for post-trial relief seeking a new trial and/or judgment notwithstanding the verdict. On September 11, 1995, following transcription of the record and oral argument the court denied plaintiffs' motion for post-trial relief. This appeal followed.

## DISCUSSION

The decision to deny a motion for a new trial is within the sound discretion of the trial court. *Graham v. Sky Haven Coal Inc.*, 386 Pa. Super. 598, 604, 563 A.2d 891, 894 (1989). A trial court is required to grant a new trial only where the court is convinced that the verdict is against the clear weight of the evidence or that the judicial process has effected a serious injustice. *Austin v. Ridge*, 435 Pa. 1, 4, 255 A.2d 123, 124-25 (1969).

Plaintiffs' first ground for the granting of a new trial is that they were improperly denied certain discovery in preparation for trial. Specifically, plaintiffs complain that the court erred in denying plaintiffs' motion to compel the production of various hospital records involving five other patients admitted into the labor and delivery area at the same time as Linda Sheetz. Similarly, plaintiffs argue that the court erred in quashing a subpoena seeking the production of these same records.

According to plaintiffs, these records relating to other patients were necessary to support plaintiffs' claim that the Lankenau staff was "too busy" the night of Leah's birth to properly monitor and care for Linda's pregnancy.

For this reason, plaintiffs sought the production of labor and delivery, caesarean section, anesthesia, shift, patient classification and patient acuity records for the five other patients admitted to the labor and delivery area in the same time frame as Linda.

Plaintiffs, however, had already received extensive discovery in this area from defendants, including over 1,000 pages of detailed deposition testimony from defendants and numerous nurses; responses to interrogatories and requests for production of documents; medical charts; the obstetrical residents' on-call schedule for September 1989; the labor and delivery nursing schedule for September 1989; the delivery room log book, with detailed records of each patient admitted to the delivery room and their care; the hospital's "census summary report" for September 16, 1989; all nursing protocols; and information regarding the number of beds, patients, delivery rooms and deliveries on the night in question.

Clearly, plaintiffs had received more than ample information to support their allegations of understaffing. The additional information sought by plaintiffs was simply redundant, irrelevant and likely to confuse the jury, and the court properly excluded it. See *Concorde Investments Inc. v. Gallagher,* 345 Pa. Super. 49, 56, 497 A.2d 637, 641 (1985). Further, granting plaintiffs access to the medical records of other patients, even with the safeguard of redacting all names and addresses, raises serious constitutional concerns regarding the right to privacy of these other patients. See *Sanderson v. Frank S. Bryan M.D. Ltd.,* 361 Pa. Super. 491, 498-99, 522 A.2d 1138, 1142 (1987), *appeal denied,* 517 Pa. 624, 538 A.2d 877 (1988). The sensitive nature of the information requested, coupled with the obvious availability of this information through other sources, con-

vinced the court that such information must be precluded from discovery.

Plaintiffs' second ground for a new trial is that the court erroneously presented to the jury Lankenau Hospital's point for charge no. 10, relating to the standard of care required of an obstetrician-in-training. The court presented the following standard of care applicable to a resident training in obstetrics:

"A resident is a licensed physician training in a speciality in a hospital. The defendant-residents in this case were not receiving special training in obstetrics at Lankenau Hospital; they were fully trained obstetricians nor were they generally practitioners without any specialized training. A resident-physician is a speciality, and a speciality must have and use the due care and skill, the same as that which is usually exercised by residents in that speciality.

"MR. ANGINO: Your honor, I think in this case they were given specialized training in obstetrics, it's a typographical error.

"THE COURT: Yes. In other words, I say that a resident must exhibit that degree of care in a specialty that they are receiving training in as others with the same amount of time and service and time in training in a particular area. They are held to that standard. The standard of care applicable to Tuckey-Larus is that she must exercise the degree of skill, learning and care normally possessed by an obstetrical resident in the circumstances of Tuckey-Larus. In other words, the number of years that she was in that particular specialty.

"You must not substitute your own judgment as to whether Tuckey-Larus exercised the care and skill of obstetrical residents at their respective levels of training. The standard of care must be established by competent and expert testimony. The standard for a resident is

higher than that of a general practitioner, but less than that of a fully trained obstetrician." N.T., vol. VI at 902-904.

The court submits that this instruction accurately reflects the intermediate standard of care applicable to a resident. Indeed, the court's instruction parallels the instruction affirmed by the Superior Court in *Jistarri v. Nappi,* 378 Pa. Super. 583, 549 A.2d 210 (1988):

"A resident is a licensed physician receiving training in a specialty in a hospital. Now, [Dr. Mangino] was not a fully-trained orthopedist nor was he a general practitioner without any specialized training.

"[Dr. Mangino] is, therefore, held to exercise that degree of skill, learning and care normally possessed by an orthopedic resident in the circumstances of Dr. Mangino." *Id.* at 588-89, 549 A.2d at 213.

Plaintiffs further argue that the court erred in failing to instruct the jury that Lankenau Hospital could be held liable for assigning residents responsibilities beyond their education and training. Such an instruction was completely unwarranted, however, in that plaintiffs had introduced no evidence at trial suggesting that the residents had been undertrained or otherwise incompetent to perform their duties. Additionally, plaintiffs at no time requested such a charge, nor did plaintiffs object to the court's failure to give such charge at trial. Read in its entirety, the court's charge unquestionably provided the jury with an accurate representation of the existing law with regard to the standard of care applicable to medical residents in Pennsylvania.

Plaintiffs' third ground for a new trial is that the court erred in precluding Dr. Mary Jane Minkin from referring to source materials not referenced in her expert report. Generally, matters related to the admission of testimony are entrusted to the sound discretion of the

trial court. *Pascale v. Hechinger Co. of Pa.*, 426 Pa. Super. 426, 435, 637 A.2d 750, 754 (1993). Pa.R.C.P. 4003.5(c) serves to preclude an expert from testifying at trial as far as such testimony would be "inconsistent with or go beyond the fair scope of his testimony in the discovery proceedings as set forth in his deposition, answer to an interrogatory, separate report, or supplement thereto." Pa.R.C.P. 4003.5(c).

Here the court limited Dr. Minkin's testimony on two occasions. In the first, Dr. Minkin was questioned regarding a study that "correlates week of gestation with weight, with chance of survival and chance of survival free of major morbidity." N.T., vol. I at 48. Because this information was not referenced in Dr. Minkin's report, which dealt with the diagnosis of premature rupturing of the membranes, the court constrained Dr. Minkin's testimony in this area. On the second occasion, Dr. Minkin was limited in her testimony regarding Lankenau Hospital's nursing budget. N.T., vol. I at 69-70. Such testimony was clearly beyond the realm of Dr. Minkin's expertise and the scope of her expert report. Beyond these two occasions, Dr. Minkin was permitted to testify with significant leeway. Plaintiffs' contention that the court prohibited Dr. Minkin from discussing basic medical standards and guidelines is simply inaccurate. See *e.g.*, N.T., vol. I at 90-93.

Plaintiffs' fourth ground for a new trial is that the court erroneously entered compulsory nonsuits in favor of Dr. Prodoehl and Dr. West. The entry of a compulsory nonsuit is proper where it is clear that a cause of action has not been established. *Gallucci v. Phillips & Jacobs Inc.*, 418 Pa. Super. 306, 316, 614 A.2d 284, 289 (1992), *appeal denied*, 533 Pa. 660, 625 A.2d 1193 (1993). In this matter, the court granted said nonsuits at the

conclusion of plaintiffs' case-in-chief on the basis that there was no evidence presented demonstrating a patient-physician relationship between Linda Sheetz and either Dr. Prodoehl or Dr. West. Indeed, counsel for plaintiffs agreed that a nonsuit was warranted with respect to Dr. Prodoehl. N.T., vol. V at 681. With regard to Dr. West, the evidence adduced at trial showed only brief moments of casual contact between Dr. West and Linda Sheetz, none of which demonstrated the existence of a patient-physician relationship. N.T., vol. II at 367-69. The court's entry of compulsory nonsuits was plainly warranted.

Plaintiffs' fifth ground for a new trial is that the court erred in permitting reference to a report by Dr. Robert Clancy. Specifically, plaintiffs complain that defendants were improperly allowed to introduce a conclusionary statement contained in Dr. Clancy's report, wherein Dr. Clancy opines that "[t]here were no events, that I am aware of, that can be directly related to [Leah Sheetz's condition] other than the prematurity itself." July 17, 1990 report of Dr. Robert Clancy at 2.

In their brief, plaintiffs cite to four occasions in which the court permitted improper references to Dr. Clancy's conclusion. Three of these citations, however, do not involve the introduction of Dr. Clancy's allegedly objectionable comment: N.T., vol. III at 393-94 (discussion between court and counsel outside presence of jury); N.T., vol. V at 715-20 (court sustains plaintiffs' objection regarding opinion as to Dr. Clancy's abilities as physician); N.T., vol. V at 786-93 (Dr. Graziani states that he relied in part on Dr. Clancy's report). The only point in the trial in which Dr. Clancy's comment was introduced was during the cross-examination of Dr. Israel Abroms. N.T., vol. II at 250.

The Superior Court examined the issue of whether a medical expert may be cross-examined through use of reports or records which have not been admitted into evidence in *Rafter v. Raymark Industries Inc.,* 429 Pa. Super. 360, 632 A.2d 897 (1993). In *Rafter,* a defense expert testified concerning the cause of plaintiff's condition. *Id.* at 367, 632 A.2d at 901. On cross-examination, plaintiff's counsel questioned the expert about the report of a subsequent treating physician which indicated a different means of causation than that cited by plaintiff's expert. *Id.* On appeal, defendants alleged that the trial court erred in allowing plaintiff's counsel to cite to out of court opinions in the cross-examination of the defense expert. *Id.* at 366, 632 A.2d at 900. In affirming the trial court's allowance of the questioning, the Superior Court wrote:

"Preliminarily, we point out that 'the scope and limits of cross-examination are within the trial court's discretion and the court's ruling therein will not be reversed in the absence of a clear abuse of discretion or an error of law.' ... The right of cross-examination 'includes the right to examine the witness on any facts tending to refute inferences or deductions arising from matters the witness testified to on direct examination.' . . . Moreover, where a medical expert is cross-examined concerning reports or records which have not been admitted into evidence but which would tend to refute that expert's assertion, it is not an abuse of discretion for the trial court to allow this cross-examination." *Rafter, supra* at 366-67, 632 A.2d at 900 (citing *Kemp v. Qualls,* 326 Pa. Super. 319, 473 A.2d 1369 (1984)).

Here, Dr. Abroms discussed the cause of Leah's condition at length on direct examination, including a denial that prematurity alone could result in such a condition. N.T., vol. II at 225. On cross-examination, defense coun-

sel challenged Dr. Abroms' conclusion by introducing the conflicting comment of a subsequent treating physician, Dr. Clancy, that he could find no cause for Leah's condition other than prematurity. N.T. vol. II at 250. Such cross-examination is permissible under *Rafter* and constituted a proper attempt to refute and discredit the testimony of Dr. Abroms.

Plaintiffs' reliance on *Allen v. Kaplan,* 439 Pa. Super. 263, 653 A.2d 1249 (1995) and *DeVita v. Durst,* 167 Pa. Commw. 105, 647 A.2d 636 (1994) is misplaced. In *Allen,* the Superior Court held that a defense expert witness, on direct examination, could not use the opinions of other medical personnel to bolster his own testimony. *Allen, supra* at 266-68, 653 A.2d at 1250-51. This holding is easily distinguishable from the situation at bar and in *Rafter,* in which an expert witness was cross-examined through use of the report of a subsequent treating physician. In *DeVita,* the Commonwealth Court held that defense counsel could cross-examine plaintiff's medical experts through the use of out of court medical reports "concerning discrepancies between details contained in the reports and the experts' observation . . . ." *DeVita, supra* at 114, 647 A.2d at 640-42. This holding clearly runs counter to plaintiffs' position.

Plaintiffs' sixth ground for a new trial is that the court erred in refusing to impose sanctions in the form of a default judgment upon defendants for their alleged failure to respond to discovery requests. The imposition of sanctions for discovery violations is within the discretion of the trial court, which is required to strike a balance between procedure only to move a case to prompt disposition and the substantive rights of the parties. *Lawrence v. General Medicine Association Ltd.,* 412 Pa. Super. 163, 167, 602 A.2d 1360, 1362 (1992). In this matter, plaintiffs initially sought sanctions from

the Honorable Marjorie C. Lawrence of the Montgomery County Court of Common Pleas and were refused. Plaintiffs then sought sanctions from this court on October 25, 1994, five days before trial, and were again refused. As found by Judge Lawrence, plaintiffs simply failed to prove such willful disregard of a court order as to warrant such an extreme sanction as entry of default judgment. On the contrary, as discussed above, the record indicates that defendants provided plaintiffs with liberal access to a vast array of discovery, much of which was of dubious relevance. Imposition of sanctions in the form of default judgment was clearly unwarranted.

Plaintiffs' seventh and final point of appeal is that the court erred in failing to enter judgment notwithstanding the verdict. "Judgment n.o.v. is an extreme remedy properly entered by the trial court only in a clear case where, after viewing the evidence in the light most favorable to the verdict winner, no two reasonable minds could fail to agree that the verdict was improper." *Robertson v. Atlantic Richfield Petroleum Products Co.,* 371 Pa. Super. 49, 58, 537 A.2d 814, 819 (1987), *appeal denied,* 520 Pa. 590, 551 A.2d 216 (1988). An examination of the record in light of this most rigorous standard reveals that the court's refusal to enter judgment notwithstanding the verdict was unquestionably proper. Dr. Weiner testified that defendants' treatment of Linda and Leah Sheetz met the applicable standard of care and Dr. Graziani testified that Leah's condition did not result from any problems associated with her care at Lankenau Hospital. Plainly, there was ample evidence offered at trial to sustain the jury's verdict.

For the foregoing reasons, this court's order of September 11, 1995 should be affirmed.